Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

_____ Division

|  |  |  |
|---|---|---|
| Pablo A. Lara | ) | Case No.   8:18cv 2794-EAK-SPF |
|  | ) | *(to be filled in by the Clerk's Office)* |
|  | ) |  |
| *Plaintiff(s)* | ) |  |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) | Jury Trial: *(check one)*   ☐ Yes   ☑ No |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) |  |
| *please write "see attached" in the space and attach an additional* | ) |  |
| *page with the full list of names.)* | ) |  |
| -v- | ) |  |
|  | ) |  |
| Chad Chronister (Hillsborough County-FL Sheriff), St. | ) |  |
| Joseph's Hospital (Tampa), Ashley Moody (State | ) |  |
| Attorney General of Florida) | ) |  |
|  | ) |  |
| *Defendant(s)* | ) |  |
| *(Write the full name of each defendant who is being sued. If the* | ) |  |
| *names of all the defendants cannot fit in the space above, please* | ) |  |
| *write "see attached" in the space and attach an additional page* | ) |  |
| *with the full list of names.)* | ) |  |

## SECOND AMMENDED COMPLAINT FOR A CIVIL CASE

### I.    The Parties to This Complaint

#### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Pablo A. Lara |
| Street Address | 12818 Cedar Forest Dr., Apt. 106 |
| City and County | Tampa, Hillsborough |
| State and Zip Code | Florida, 33625 |
| Telephone Number | (813) 638-5928 |
| E-mail Address | |

#### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

Defendant No. 1

| | |
|---|---|
| Name | Chad Chronister |
| Job or Title *(if known)* | Hillsborough County Sheriff |
| Street Address | P.O. Box 3371 |
| City and County | Tampa, Hillsborough    FL |
| State and Zip Code | Florida, 33601 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | St. Joseph's Hospital (Tampa) |
| Job or Title *(if known)* | |
| Street Address | 3001 W. Dr. Martin L. King, Jr. Blvd. |
| City and County | Tampa, Hillsborough    33607 |
| State and Zip Code | Florida, 33607 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | Ashley Moody |
| Job or Title *(if known)* | Florida State Attorney General |
| Street Address | Office of Attorney General State of Florida The Capitol PL-01 |
| City and County | Tallahassee, Leon |
| State and Zip Code | Florida, 32399 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal question               ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A. If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

Fourth Amendment to the U.S. Constitution
Fourteenth Amendment to the U.S. Constitution

### B. If the Basis for Jurisdiction Is Diversity of Citizenship

1.  The Plaintiff(s)

    a.  If the plaintiff is an individual

        The plaintiff, *(name)* _____ , is a citizen of the State of *(name)* _____ .

    b.  If the plaintiff is a corporation

        The plaintiff, *(name)* _____ , is incorporated under the laws of the State of *(name)* _____ and has its principal place of business in the State of *(name)* _____

    *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.  The Defendant(s)

    a.  If the defendant is an individual

        The defendant, *(name)* _____ , is a citizen of the State of *(name)* _____ . Or is a citizen of *(foreign nation)* _____

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

    b.    If the defendant is a corporation

        The defendant, *(name)*         , is incorporated under

        the laws of the State of *(name)*         , and has its

        principal place of business in the State of *(name)*     .

        Or is incorporated under the laws of *(foreign nation)*     .

        and has its principal place of business in *(name)*     .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

    The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.
On 05/05/2015, Plaintiff was arrested by Sheriff Deputy Joseph L. Lopez, after plaintiff was summoned in a telephone call by Deputy Lopez, to present himself to plaintiff's house, detention without any legal justification (supposedly under the Florida Baker Act). Apparently Deputy Lopez had been summoned by my son Albert P. Lara, (now deceased) in one of Albert's frequent emotional incidents due to his abuse of a medically prescribed opioid. Deputy Lopez would tell Plaintiff that Albert claimed that Plaintiff deserved to be taken to the hospital because Plaintiff alleged lack of cooperation in the treatment of a diagnosed depression. Plaintiff arrested, and taken to the psychiatric emergency room of St. Joseph's Hospital (Tampa) The said medical facility retained Plaintiff, for more than 9 hours without any evaluative medical intervention, (period of time Plaintiff was deprived of food and liquids) just to conclude, after 18 hours of detention, Plaintiff's detention was not medically warranted.

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.
1. Plaintiff asks the Court order a monetary compensation in favor of Plaintiff against Hillsborough County Sheriff, for the amount of $100,000 (one hundred thousand dollars) for the emotional hurt inflicted on Plaintiff by the intervention of Deputy Joseph L. Lopez, that involved the Plaintiff's unwarranted deprivation of his freedom, protected by the Fourth and Fourteenth Amendments to the U.S. Constitution
2. Plaintiff asks the Court to order St. Joseph's hospital to pay Plaintiff a monetary compensation for the amount of $50,000 (fifty thousand dollars) for the suffering inflicted on Plaintiff as a consequence of St. Joseph Hospital's unwarranted, involuntary Plaintiff's retention for more than 18 hours without a medical justification, what showed a lack of respect toward Plaintiff's emotional wellbeing (See Attachment #1: Plaintiff's medical report issued by St. Joseph's Hospital).

3. Plaintiff asks the Court declares as unconstitutional,  under the Fourth Amendment of the U.S. Constitution the Florida Law Baker, as a way to force the Florida Legislature to modify the so called Baker Act in a way the statute is not further abused, as it was against Plaintiff and several THOUSAND other citizens (including minors), as documented by the Tampa Bay Times research journalism (See Attachment #2: Research article published by Tampa Bay Times)

## V.      Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.      For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:       12/23/19

Signature of Plaintiff

Printed Name of Plaintiff       Pablo A. Lara

### B.      For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

Case # 8:18cv 2794-EAK-SPF

Attachment #1:  Medical Evaluation on Plaintiff by St. Joseph's Hospital

Case # 8:18cv 2794-EAK-SPF

Attachment #2 : A news research article published by the Tampa Bay Times on 12/10/2019

https://www.tampabay.com/news/education/2019/12/10/floridas-flawed-baker-act-rips-thousands-of-kids-from-school/

# Florida's flawed Baker Act rips thousands of kids from school

A cop car comes. A child is handcuffed and taken to a mental health facility. The scene is all too frequent at public schools across the state.

Sarah Henderson with her son, Braden, who was committed under the Baker Act after a joking remark at school. [JOHN PENDYGRAFT | Tampa Bay Times]
By Megan Reeves and Jack Evans
Published Yesterday
Updated Yesterday

Over the past seven years, children have been taken from public schools in Tampa Bay more than 7,500 times and temporarily placed in mental health facilities.

They often leave campus handcuffed in the back of police cruisers. Some are as young as 6.

The numbers are climbing here and across Florida under the Baker Act, a 48-year-old state law used to involuntarily commit people deemed a danger to themselves or others.

Inside schools, officials are invoking the Baker Act more readily as increasing numbers of young people fall into depression or attempt suicide, and as efforts intensify to prevent mass shootings at the hands of troubled students.

But a *Tampa Bay Times* investigation points to glaring weaknesses in the system — from a lack of parental consent, to students being wrongly committed, to facilities that put students in harm's way. The *Times* found cases of children being improperly housed with adults in mental health centers, or being sexually or physically assaulted while in their care.

Florida lawmakers have done little to address problems or increase accountability. The state does not even track what's happening in schools.

A database built by the *Times* shows the rate of commitments for local students rose 35 percent in just the last five years.

The increase was even more pronounced in Pinellas, Pasco and Hernando counties, where the rate rose more than 75 percent.

Available state records echo these findings. They show the Baker Act is being used more than ever on Tampa Bay residents under 18, and at a level that exceeds the state average.

And while commitments across Florida have climbed for all age groups, they are up most dramatically for kids.

Connor Lovejoy was 8 years old the first time the Baker Act was used on him. His grandmother and caretaker, Cathy Lovejoy, left work early when she got a call from Gulf Trace Elementary in Holiday.

She didn't know the Baker Act could be used on a child, much less one with autism. Connor's meltdowns could be scary, but people close to him knew how to calm him.

When the hospital finally released Connor three days later, he was sobbing.

He asked his grandmother: "Why didn't you get me when they took me?"

Cathy tried to explain. But he had the cognitive ability of a 4-year-old. All he knew was that he'd been handcuffed, taken to a strange place and kept from the woman who cares for him.

How could she explain something like that?



Connor Lovejoy, 12, hugs his sister Nevaeh Lovejoy at the tail end of a meltdown in August. Their home is filled with coping mechanisms, including two therapy dogs, a stuffed animal named "Big Bear," a comfort blanket and family hugs that help deescalate unacceptable behavior. [JOHN PENDYGRAFT | Times]

• • •

The Baker Act can kick in without warning.

A teenager says something on Snapchat, or scribbles about death in a textbook, or cries in the counselor's office.

A deputy glimpses cuts on a student's arm.

A child is disciplined for spilling glitter, then thrashes around on the way to the principal's office.

The *Times* found these and many other cases in law enforcement reports.

For Braden Henderson, the Baker Act started with a joke.

In the fall of 2018, Braden, then 11, was walking with his sixth-grade class at Hernando County's Powell Middle School when he noticed ropes on the ground. As he'd later tell the *Times*, he wanted to make his friends laugh, so he said the first thing that popped into his head.

**Sign up for our Daystarter newsletter**



Today's top headlines and information delivered to your inbox every morning

Find all our newsletters

"Oh look, ropes," he quipped. "Time to hang myself."

**RELATED:** The Baker Act set out to improve care. Now it's ensnaring more children.

A substitute teacher overheard and sent Braden to a counselor's office. When the counselor asked if he was depressed, Braden's mother, Sarah Henderson, told the *Times*, he said he was sad because his grandmother had recently died.

Soon, a school resource officer decided to use the Baker Act. Someone called Braden's dad, Doug Henderson, who rushed from his job at a nearby clinic. But it was too late by the time he got there.

The best the deputy could offer, Doug Henderson said, was to let him carry Braden, bawling and grasping for door frames, to the back of a squad car. He was taken to Springbrook Hospital, the county's only Baker Act receiving facility, which is meant to treat adults, not children.

"It was kind of a blur," Sarah Henderson said.

"We were in disbelief," her husband added. "Shock."

• • •

A commitment under the Baker Act can be traumatic. When mental health facilities don't follow the law, it only gets worse.

A *Times* review of police reports, state inspections and lawsuits at the roughly 50 children's crisis units spread across Florida's 67 counties reveals how things can, and do, go wrong.

Inspectors found at least four facilities either failed to separate children from adults or had no policies in place to separate them, even though state law protects minors under 14 from contact with adults in a Baker Act facility.

In 2016, one teenage girl was groped by an adult male patient in the waiting room at Lifestream Behavioral Center in Leesburg. The director of nursing didn't believe the girl until videotape confirmed what happened. Sherry Olszanski, a spokeswoman for Lifestream, said the crisis center has since moved the children's unit to another building on the property.

"One bad day turned into 100 bad days."

*Hernando County parent Kerry Alonge, whose 9-year-old son was committed under the Baker Act.*

In 2015, a jury ordered a Vero Beach crisis center in Indian River County to pay $1.3 million to an 8-year-old girl who suffered extreme separation anxiety from her mother and woke up to find a naked 17-year-old patient in her bed. He had ejaculated on her night clothes and covers.

The girl's family learned that Indian River Medical Center's behavioral health center placed the boy in the bedroom next to the girl, even though the staff knew he had "exhibited sexually inappropriate proclivities toward young girls," according to the lawsuit filed by her guardian. The hospital, which has changed its name, declined to comment.

This past April, a 9-year-old Hernando County boy with autism was sent to Central Florida Behavioral Hospital in Orlando, where his roommate sexually assaulted him in the shower, according to his mother, Kerry Alonge.

Three hours passed before someone notified her and her husband, said Alonge, who provided medical documents supporting her account. The boy was taken to nearby Arnold Palmer Hospital for Children and evaluated.

The case has been reviewed by the state Department of Children and Families and the Orange County Sheriff's Office, which said its investigation was ongoing and declined to release a report. In a statement, Central Florida Behavioral said the case was "fully investigated and found to be unsubstantiated."

When the center investigated, Alonge said, a nurse asked if her son is known to lie.

"One bad day turned into 100 bad days," she said. Now Alonge homeschools her son.

**READ THE FIRST STORY IN THIS SERIES, POWERLESS:** You're trapped. They're cashing in.

State inspection reports show some facilities routinely fail to provide a psychiatrist to see children within 12 hours, as required by law, and others fail to properly screen employees by forwarding their names to Florida's Agency for Health Care Administration for review.

Children have been left overnight in waiting rooms or on the adult side of crisis centers, which are sometimes hours away from home.

One 13-year-old girl was taken to the Suncoast Behavioral Health Center in Bradenton after a school resource officer learned she told a friend she had argued with her mother and wanted to throw herself off the bus.

She didn't mean it, said her father, John Arthington, a Gainesville professor who hired an attorney to win his daughter's release.

The first night, the girl pushed two chairs together to make a bed in the waiting room, which she shared with an adult patient. Sixteen hours after her arrival, she was moved to the children's side.

Arthington said Suncoast threatened to extend the Baker Act commitment if he did not sign his daughter over voluntarily. He refused but Suncoast still declined to release his daughter. Last June, the Agency for Health Care Administration fined Suncoast $2,000 for failing to separate the 13-year-old from an adult and for keeping her past 72 hours without asking the court for an extension.

Suncoast's CEO, Brandy Hamilton, would not comment on the case but said patients in the intake room were always monitored for safety. Sometimes, she said, there might be a wait for an open bed but patients were provided recliners.

"On the phone, they told me they had a room for her," Arthington recalled. "They had no room for her, yet they charged us $2,000 a day."

• • •

The *Times* analyzed 365 police reports that describe Baker Act commitments in schools across Tampa Bay. In more than two-thirds of those cases, officers wrote, they didn't talk to parents until after they'd decided to use the Baker Act and sent the child to the hospital.



Hernando County Sheriff's Sgt. Cinda Lillibridge [Courtesy of Hernando County Sheriff's Office]

Sheriff's officials in Hernando said they typically don't contact parents before invoking the Baker Act. Sgt. Cinda Lillibridge said that rule is based on concern that parents will show up at the school angry.

Licensed counselors and social workers also don't have to be present — or even involved — in a Baker Act decision. Police handle the majority of cases. In Tampa Bay, only the Pinellas school system allows mental health professionals to make the call.

In Florida, clinical social workers must meet a long list of qualifications to obtain a license that allows them to use the Baker Act. Among them: a master's degree in social work; a passing score on a national exam; and two years working under a licensed clinical social worker, including 1,500 hours of therapy with clients.

For law enforcement, the state requires agencies to offer crisis intervention training to officers based in schools. But sometimes others, such as road deputies, are the ones responding to campuses and deciding to use the Baker Act, police reports show.

Agencies may opt for more training, but there is no uniform requirement. And when officers do get training, they speak about it in terms of hours, not years of experience or academic degrees.

District administrators in Hillsborough say all the county's 229 traditional public schools have counselors, but many don't have the licenses that allow them to initiate a Baker Act case.

It's cheaper and easier for school districts to yield to law enforcement than to upgrade their staffs, said Martha Lenderman, who formerly directed the state's Baker Act program.

**ALSO READ:** An autistic child melts down. An officer makes a decision. A family suffers the consequences.

The rising number of Baker Act commitments is "a symptom of system failures and systems that are overwhelmed and in need of better resources and more training," said Dr. Mark Cavitt, Director of Pediatric Psychiatry Services at Johns Hopkins All Children's Hospital in St. Petersburg.

"When you have the expertise and training," he said, "you don't reach for the Baker Act nearly as often as when you don't."

Licensed mental health professionals in Pasco schools have asked district officials why they can't use the Baker Act, said mental health liaison Amanda Medina. They've never gotten an answer.

"It's taken out of our hands," she said. "It's crippling."

The Baker Act is meant to be used on people who have a mental illness, pose a "real and present threat of substantial harm" and likely won't get help for themselves.

The statute says officers "shall" take into custody anyone who meets the criteria, while it says mental health workers "may" do so. It's a small difference that has a big impact in practice, Lenderman said.



Martha Lenderman, the state's Baker Act director in the 1990s, is considered the foremost expert on the law. [JOHN PENDYGRAFT | Times]

In the cases analyzed by the *Times*, police reported consulting with mental health professionals less than half the time.

Nicholas Cutro, immediate past president of the Florida Association of School Psychologists, said schools may want to pass off responsibility for the Baker Act to avoid liability. But that comes with costs, too, he said.

Children can associate cops with discipline, so a resource officer's presence in a high-stress situation could escalate it — maybe to the point of using the Baker Act where it might not have been needed initially, he said.

Law enforcement officials interviewed by the *Times* all said they'd have no problem if mental health professionals were able to decide when to use the Baker Act.

Commander Charles Coeyman, who oversees the St. Petersburg Police Department's school resource officers, said he'd rather they focus on enforcing laws and keeping schools secure from outside threats.

Mental health professionals can recognize disorders, he said, and tell the difference between "somebody that's just having a bad day versus someone that's truly in crisis."

• • •

# The Baker Act and kids

A *Tampa Bay Times* analysis found significant increases in the rate the Baker Act is used in Tampa Bay area public schools. The rate (Baker Act uses per 1,000 students) spiked more than 75 percent in Pinellas, Pasco and Hernando counties over the past five years.



**117** Percentage increase in the rate the Baker Act was used on Florida children in the last 17 years of available data. It went from 547 times for every 100,000 kids in 2001-02 to 1,186 times per 100,000 in 2017-18.

**35** Percentage increase in the rate the Baker act was used on K-12 campuses in Tampa Bay since 2014.

Sources: Pinellas County Schools; Florida Department of Education; University of South Florida Baker Act Reporting Center; sheriff's offices in Hillsborough, Pasco and Hernando counties; and police departments in Dade City, New Port Richey, Plant City, Tampa, Temple Terrace and Zephyrhills.

Note: Pinellas County is the only area school system that tracks instances of the Baker Act on its campuses. The numbers for Hillsborough, Pasco and Hernando come from law enforcement agencies, not the school districts.

Across Florida, more than 36,000 children fell under the Baker Act in 2017-18, according to the University of South Florida Baker Act Reporting Center, where researchers have gathered state data since 1997.

That's an average of nearly 100 every day.

But the state doesn't track how many of those cases started at schools — even though statistics suggest that's where it's often happening.

Child Baker Act numbers plummet in the summer and in December, when school is out. Fewer incidents of the Baker Act happen on weekends, too.

Many factors play a role in the increases, school officials and police officers say.

Some noted a lack of mental health resources outside schools, especially in rural or impoverished areas. Others pointed to social media, where students express their darkest thoughts to hundreds on the internet — instead of writing in a diary as they may have in previous generations.

A simpler answer, contends Donna Sicilian, a licensed clinical social worker and director of student services for Pinellas schools, is that more students are "actively suicidal."

"They have intent, they have a plan, they have the means," she said.

Dozens of school officials and law enforcement officers working across Tampa Bay also pointed to an increase in awareness of mental health issues. Jill Kolasa, director of student services in Hernando, believes that is what's behind the uptick there, where the *Times* found students are about 32 percent more likely to be placed under the Baker Act than anywhere else in the region.

More students than ever go to guidance counselors with worries about classmates, Kolasa said, leading to the Baker Act being used more than ever, too.

Coeyman, the St. Petersburg police commander, said the increases in Pinellas have been mostly driven by anonymous reporting apps that make it easy for students to relay concerns about their peers. The state launched one of the apps, FortifyFL, after the 2018 mass shooting at Marjory Stoneman Douglas High in Parkland.

It was funded by a Legislature known for its stinginess with mental health appropriations. That funding was part of the same post-Parkland bill requiring armed security in all public schools.

And it sent a message to students: "If you hear something or feel something, say something," said Carly Paro, a licensed mental health counselor and assistant professor at Nova Southeastern University in Clearwater.

"The problem is that when kids talk and the response is so dramatic, then eventually, they'll stop talking."

Parkland remains top of mind for school resource officers and mental health professionals. Officials at Stoneman Douglas High reportedly tried to have the shooter placed under the Baker Act long before he killed 17 people.

After Parkland, Baker Act commitments surged in some parts of Florida, including a 39 percent spike in Pinellas last school year. Pasco commitments increased by about one-fourth while Hillsborough actually saw a decrease.

Sgt. Lillibridge in Hernando said the spike is understandable.

In previous years, she said, a school without a full-time deputy would have called the Sheriff's Office for help with a crisis. And in the 10 minutes it took for a deputy to arrive, the situation may have resolved itself.

Now, officers are right down the hall.

• • •

One morning in July, a couple dozen teachers, coaches, counselors and principals filed into a Hillsborough classroom for Youth Mental Health First Aid training, which the state funded after the Parkland shooting.

Two school psychologists guided the group through a thick paperback manual and a PowerPoint full of statistics. For one exercise, they clipped a wide sheet of paper to an easel, letters A to Z written in neat columns.

They told the class to call out signs of typical adolescent behavior for each letter, then asked for signs of mental illness. When a word on the chart applied to both categories, they told the group to yell out "Bingo!"

Over the next five minutes, they hit "Bingo!" a dozen times:

*Energetic ... Impulsive ... Rebellious ... Temperamental ... Uninhibited ... Extreme.*

All thoughts or threats of suicide should be taken seriously, the school psychologists said.

But the more ambiguous symptoms underscored one of the workshop's themes: You have to know your students well enough to see when something warrants a call for help.

"Some of these things in isolation could be normal," said instructor Cheryl Gelley. "But if you see a combination, it might not."

Sicilian, the student services director in Pinellas, said she believes every student involuntarily hospitalized has needed such a drastic measure.

Lillibridge, the Hernando sheriff's sergeant, conceded that deputies sometimes use the Baker Act on children who aren't mentally ill but who are having "a mentally ill problem." Still, she and others in the office said they don't regret a single time they've used the law.

Records show students sometimes outline imminent plans to kill themselves or even ask to be hospitalized. But they also show that student crises often fall into complicated and contradictory gray areas, at odds with the Baker Act's terse and tidy language.

The *Times* interviewed families across Tampa Bay who said their children have been placed under the Baker Act for behavior that alarmed police but is, for those children, normal.

Cathy Lovejoy has heard doctors say it over and over: Connor shouldn't have been brought to them under the Baker Act. He didn't have a mental illness.

But it kept happening. Like the time in May 2016, when Connor, then 9, kicked a teacher, an assistant principal and a behavioral specialist during a meltdown.

A deputy responded to the assistant principal's office, and Connor, feeling cornered, went for the officer's Taser. The deputy grabbed his arms and held him to the ground. Connor screamed and swore after being released, and the deputy took him to Morton Plant North Bay Hospital in New Port Richey.



Connor Lovejoy with his grandmother, Cathy Lovejoy, 57. With them, from left, are Coco, a therapy dog, a new kitten named Weasley, and Loki, a trained service dog. Connor is diagnosed with autism, fetal alcohol syndrome, intermittent explosive disorder, oppositional defiant disorder and attention-deficit/hyperactivity disorder. None of them is a reason to invoke the Baker Act. [JOHN PENDYGRAFT | Times]

As the hospitalizations piled up, one of Connor's school friends told Cathy that their teachers had started using the Baker Act as a threat: Calm down or you'll be taken away again.

"The Baker Acts are a knee-jerk reaction to, 'I have a problem here, and instead of taking my time to handle the problem … he'll be out of the room and I can continue on with the rest of my day,'" Cathy said. "It was the quickest and easiest (way) to restore order."

Some police records reveal officers' confusion over what constitutes a mental illness.

In a report from May 2018, a Pasco school deputy wrote about using the Baker Act on a 12-year-old at Charles S. Rushe Middle School in Land O'Lakes. The boy had gotten in trouble for playing a loud noise on his phone during class. He threw a chair before being restrained by the deputy.

"Due to (his) Autism I took him into custody under the Florida Baker Act for his violent actions," the deputy wrote. He added that he used the Baker Act "in lieu of placing him under arrest for assault and resisting arrest."

Experts don't consider behavior related to autism a valid reason to use the Baker Act. And the law isn't meant to be used as a disciplinary measure.

**MORE ON FLORIDA'S BAKER ACT:** 'My hands were tied. I couldn't do anything about it.'

Vicki Papaemanuel, the head of student psychology for Pasco schools, said a meltdown by an autistic student could be a normal response to discomfort or overstimulation.

If she doesn't know a student well, she'll pull in a teacher who does. That person can help her understand what a student really means as she asks the questions that are part of a suicide risk assessment — do they want to hurt themselves or others? Have they done it before?

"Do I believe that a 6-year-old with autism could be answering yes to these questions? Yes," Papaemanuel said. "Is it likely? No."

Police records show that sometimes students are committed under the Baker Act based on threats that aren't credible.

In early 2017, Pasco deputies interviewed a 13-year-old Centennial Middle School student as part of a drug investigation, according to an incident report.

The student told deputies he felt like "someone was controlling his body." Then he laid out the means he'd use to kill himself: A rope swing in a neighbor's front yard, a cache of knives hidden under his bed. He'd confided all of this to his older brother, the student told deputies.

Then came a commitment under the Baker Act.

The next day, deputies visited the boy's house, where his mother told them her son didn't know anyone with a rope swing in their front yard. A search of the house turned up no knives under his bed.

The mother suggested to deputies that the boy was afraid of getting in trouble for having marijuana, so he did what he could to get out of the situation. The older brother said the boy had never shared anything about wanting to hurt himself.



Pasco County Sheriff's Lt. Troy Fergueson. [Times (2014)]

Deputies in Pasco check the credibility of every threat a student makes, said Lt. Troy Fergueson, who oversees those who work in schools. They visit the child's home, talk to parents, look for means and take note of the conditions.

But that doesn't always happen before the Baker Act is invoked. The timing depends on multiple factors, like the severity and specificity of the threat and the age of the student, Fergueson said.

The problem is compounded by the fact that resources aren't always available to kids who need mental health care but not hospitalization.

In Hernando and Pasco schools, staff reported hearing of months-long waiting lists for child psychiatrists in their communities. Even when appointments open up, families in these counties, where more than half of all public school students are considered economically disadvantaged, may lack the funds to pay for treatment or the transportation to get there.

In that environment, the Baker Act is no longer the last line of defense — it's often the only line of defense, said Medina, the Pasco mental health liaison.

"Maybe it's one of those gray areas," Papaemanuel said of the process for committing students, "but I know this will get a child in front of a psychiatrist, and that's what they need."

• • •

By the time Connor Lovejoy finished elementary school last May, his grandmother had lost count of how many times he had left campus in the back of a deputy's car.

He could describe the feeling of handcuffs, and the stares from classmates when officers put them on.

He once likened himself to a criminal.

Cathy Lovejoy lost trust in the school system. Connor's case manager suggested a way out, through a state scholarship that sends special-needs kids to private schools. In August, he started at a small Christian school a mile from their new home in New Port Richey.

But on the 10th day of the school year, Cathy got a call: Connor had jumped a low gate and walked out through the school's unlocked front door.

Police were called, and an officer soon pinned him to the ground. He walked Connor back to school in handcuffs while his classmates watched.

This time, a counselor arrived from BayCare's Mobile Crisis Response Team, part of a new partnership between BayCare Health System and law enforcement in Pasco and Hernando.

She could tell Connor was autistic, that he didn't meet Baker Act criteria.

Cathy's relief lasted until the school emailed that Sunday. Connor was expelled, the grant money gone.

The next day he enrolled at Paul R. Smith Middle, another public school.

One afternoon earlier this year, he came home from school, sprawled on the couch and flung his arms around Loki, a service dog in training.

The Lovejoys had found Loki, named for the god of chaos in the Thor movies, late last year at a local shelter. He had been in the back row of cages, among the "mean dogs."

He'd been adopted before, Cathy learned, but the owner returned him when he chewed up an expensive couch. When Cathy walked him, he did nothing worse than pull on the leash.

This was the right dog for Connor, she decided. He had just been put in the wrong place.



Connor Lovejoy and Loki. [JOHN PENDYGRAFT | Times]

*Staff Writer Leonora LaPeter Anton and Senior Researcher Caryn Baird contributed to this report.*

---

## About the story

How many times has the Baker Act been used in Florida public schools? Are there trends that would highlight problems, lead to improvements, maybe save lives?

State officials don't know; they're not keeping track.

Mental health advocates pushed for years for the state to add a field on one of the forms required with each Baker Act, to indicate whether an incident happened during the school day.

Lawmakers agreed in the mid-2000s, but that section of the form is not regularly filled out, so the data gleaned from it has been deemed unreliable.

"We feel like some of the numbers are suspiciously low when it comes to school," said Annette Christy, director of the Baker Act Reporting Center at the University of South Florida.

As of last year, the center stopped bothering to tally the numbers.

In Tampa Bay, only the Pinellas County school system tracks data about how and when the Baker Act is used on campuses. The Pasco County school district is beginning to record Baker Act data, but it isn't complete. Information is gathered from facilities with parental consent, but that data doesn't differentiate between students taken from school and elsewhere, and parents don't have to comply.

To create a picture of how often the Baker Act is used in local public schools, the *Tampa Bay Times* built a database using thousands of records from 17 law enforcement agencies across Pinellas, Hillsborough, Pasco and Hernando counties, as well as Pinellas school data.

Some agencies couldn't provide data as far back as 2013. Some included incidents that happened steps off a school campus, which may have involved a student but the *Times* did not count. And numbers reported by Pinellas schools were much higher than those gleaned only from police records.

There are likely many more cases of Baker Act commitments on public school campuses than the *Times* database was able to capture. The absence of a reliable state system to measure how the Baker Act is used in schools makes it nearly impossible to get a complete and accurate count.

## Support our journalism

Reporters Megan Reeves and Jack Evans **spent nearly a year on this story**, talking to families, school officials, mental health professionals and law enforcement officers. They collected public records to build a new database showing when the Baker Act is used in schools, and they analyzed hundreds of police reports to understand the trends behind its usage.

*In-depth journalism like this takes time and money — and it's only possible with the support of readers like you.*

Please consider supporting us with a **tax-deductible donation** to the *Tampa Bay Times* Investigative Fund.